**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **GARTH MERRICK VOIGT, not** ) <br> **individually but as the appointed liquidator** ) <br> **of CASTELLANO BELTRAME (Pty)** ) <br> **LTD.,** ) <br> ) <br>         **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> **FABRICUT, INC.,** ) <br> ) <br>         **Defendant.** ) | Case No. 10-CV-662-TCK-TLW |

## OPINION AND ORDER

Before the Court is Plaintiff Merrick Voigt's Motion for Summary Judgment (Doc. 50) and Motion in Limine Concerning Recoupment (Doc. 55).

**I.    Factual Background**

Defendant Fabricut, Inc. ("Fabricut"), an Oklahoma corporation, is a distributor of fabric, trimmings, wallpaper, and hardware. In the mid-1990s, Fabricut began a business relationship with Castellano Beltrame (Pty) Ltd. ("Castellano"), a South African corporation in the business of manufacturing decorative textiles. From this time until 2009, Fabricut ordered product from Castellano. On December 17, 2009, in a case entitled *Franco Giovanni Beltrame v. Castellano Beltrame (Pty) Ltd.*, Case No. 5025/2009, Castellano became the subject of an involuntary sequestration, or bankruptcy, proceeding in South Africa initiated by one of Castellano's largest creditors, Franco Beltrame. Plaintiff Garth Merrick Voigt ("Voigt") was appointed as a "liquidator" of the Castellano bankruptcy estate. As an appointed liquidator of Castellano and on behalf of the Castellano estate, Voigt filed the instant lawsuit against Fabricut.

    **A.    Voigt's Claims**

Voigt asserts claims for breach of contract, account stated, and unjust enrichment based upon Fabricut's non-payment of forty-two invoices in the total amount of $324,033.65. Such invoices and their corresponding airway bills are attached to Voigt's Complaint. (*See* Compl. ¶ 8 & Ex. A.)

### B.     Fabricut's Recoupment Defense and Counterclaim

Fabricut filed a counterclaim against Voigt for breach of the promise of "product continuity," which generally refers to a manufacturer's promise to continue making its product for a specified length of time. Voigt moved to dismiss the counterclaim, arguing that (1) the only proper forum for such claim was the South African bankruptcy proceeding, and (2) the Court should abstain from deciding the counterclaim based on international comity. The Court permitted Fabricut's counterclaim for any pre-sequestration breaches to proceed only under the defensive doctrine of recoupment and permitted the counterclaim for any post-sequestration breaches to proceed as an ordinary claim. The Court declined to abstain based on international comity abstention. (*See* 5/23/11 Opinion and Order, Doc. 30.)[1]

### C.     Summary Judgment Evidence

Voigt's motion for summary judgment is supported only by the invoices and corresponding airway bills. It is not supported by the underlying purchase orders or any other evidence of the parties' communications leading to the subject invoices. In its response brief, Fabricut submits numerous "additional material facts" in opposition to the motion. These facts explain the fabric industry, the parties' course of dealing, and the parties' communications leading to the purchases

---

[1] The Court entered an amended version of its ruling on the motion to dismiss in order to correct certain errors. (*See* Doc. 75.)

billed in the invoices. In its reply, Voigt does not attempt to dispute these additional facts. Instead, Voigt argues that such facts are irrelevant and should be stricken. The Court denies Voigt's request to strike Fabricut's additional material facts. As explained below, such facts are relevant to the issues presented. Thus, much of the background information below is based upon Fabricut's undisputed evidence.

### 1. Trimmings Programs - General Process

Throughout their business relationship, Fabricut's "trimmings consultant," Sharon Cash ("Cash"), worked with Castellano designers to develop numerous "trimmings programs."[2] The development of a trimmings program required substantial time and collaboration between Cash and Castellano and sometimes involved Cash traveling to South Africa at Fabricut's expense. Generally, a trimmings program consists of numerous coordinated items in a range of colors and designs. Once the trimmings programs were designed, Castellano would complete a form entitled Fabricut, Inc. Trim Specification Sheet ("specification sheet"). All specification sheets in the record before the Court contain the following continuity provision:

> Continuity: Must be minimum of three years. If item is being booked,[3] we must have 3 year continuity from the time the books are shipped to our customers.

(*See, e.g.,* Resp. to Mot. for Summ. J. at Ex. B-1 (footnote added).) In his deposition, Fabricut CEO David Finer ("Finer") explained the three-year product continuity provision:

> Inherent in any purchase by Fabricut, or any other distributor, one makes a significant investment in inventory and sample equipment. The only way to – the only way to return that investment is by servicing of that equipment.

---

[2] "Trimmings" are decorative embellishments such as piping, tassels, and fringes used with fabric in interior decorating.

[3] As explained below, the term "booked" refers to the item being part of a sample book.

3

> . . .
> [I]f in fact after two and a half years [Castellano] came and said on said program there was no longer continuity, we would consider that a severe breach of trust because at two and a half years we would not have realized our full potential or full revenue profile. If [Castellano] came to me at four and a half years [and] said, David, we are going to have to change yarns, I would feel that it's reasonable. And then we would begin to make the switch.
> . . .
> [A]ny sample book that we make . . . we would never expect less than three years. We demand three years.

(*See id.* at Ex. F, at 78, 83.)

Following receipt of these specification sheets containing the promise of product continuity, which are signed by Castellano employees, Fabricut placed orders for product inventory and sample books for a particular trimmings program. Sample books are (1) the means by which customers select products, and (2) a representation by the distributor to the market that the product is available for delivery. Upon receipt of the sample books, Fabricut then marketed the trimmings program to its customers. Over the years, Cash and Castellano developed several trimmings programs without problems, and Fabricut purchased millions of dollars of product from Castellano. According to Fabricut, Castellano's quality and reliability began declining in the mid-2000s.

### 2. Anthology Collection

Fabricut claims to have experienced problems with a trimmings program known as the Accents Anthology Trimmings Collection ("Anthology Collection").[4] Following collaborative development of the Anthology Collection by Cash and Castellano designers, Cash received specification sheets from Castellano for the collection. These specification sheets, which are dated

---

[4] According to Cash, Castellano employees sometimes referred to the Anthology Collection as "Portfolio," and this name is used by Castellano in certain relevant correspondence.

July 19-August 10, 2007, contain a three-year product continuity provision identical to that explained above.

From November 20-26, 2007, Fabricut placed orders for product from the Anthology Collection. (*See id.* at B-2.) On January 22, 2008, Fabricut sent a work order for 3500 Anthology Collection sample books and stated that Fabricut would need "60 sets by April 7, 2008 for our sales reps to go out and pre sell this collection." (*Id.* at Ex. B-3.) By December 2008, the Anthology Collection sample books had not yet arrived. According to Finer, Castellano asked Fabricut to make "advance payment" on these sample books. Finer also testified that Fabricut made an $80,000 advance payment in two $40,000 installments, by checks dated December 18 and 23, 2008. (*See id.* at Ex. C-1.) Fabricut contends that the first Anthology Collection sample book arrived in July 2009, approximately 15 months after the requested date of April 2008. According to Fabricut, invoices 2131, 2430, 2619, 2796, 2798, 2166, 3362, and 3363 are for purchases of Anthology sample books.[5]

### 3. Jeweled Collection

Fabricut also claims to have experienced significant problems with a trimmings program known as the Jeweled Obsession Collection ("Jeweled Collection"). From February-April 2008, Castellano completed specification sheets for the Jeweled Collection, all of which contained the three-year product continuity provision. (*See id.* at Ex. B-5.) In April 2008, Fabricut placed orders for product from the Jeweled Collection and then, in December 2008, also ordered 1500 sample books. (*See id.* at Exs. B-6, B-7.) The sample book work order states that Fabricut would need 60 Jeweled Collection sample books by May 1, 2009 and that the remaining books should arrive by July

---

[5] These invoices total $235,672.80.

1, 2009.  (*See id.* at Ex. B-7.)  Fabricut ultimately received the Jeweled Collection product but claims that all such product contained a defective bead.  (*See* Cash Dep., Ex. E to Resp. to Mot. for Summ. J., at 12:15-14:11 (explaining that bead used in product was "bad" and "diseased looking" and was "completely different" than the one promised during development process).)

In November 2009, Castellano representative Ian Huenis ("Huenis") flew to Tulsa and met with Cash and Finer.  According to the evidence presented by Fabricut, Fabricut offered to accept all defective product at a 10% discount; Castellano countered with a 5% discount (*see id.* at Ex. D-1 (email from Huenis stating that he could "offer a 5% discount on the product with has the affected bead"); and the parties never reached an agreement.  Fabricut never received the Jeweled Collection sample books and contends that it could therefore not market the defective product it had.  Finer testified that, on or around December 2010, he made the decision to stop paying any Castellano invoices due to these and other problems.  According to Fabricut, invoices 2286, 2287, 2288, 2289, 2290, 2291, 2292, 2293, 2295, 2296, 2297, 2298, 2299, 2303, 2304, 2305, 2306, 2307, 2477, 2839, 2952, 4909, 4986, and 5425 are for Jeweled Collection product.[6]

### 4. Post-Bankruptcy Dealings

On January 5, 2010, Voigt and Vic Beltrame sent a letter to Finer informing him that Castellano had been placed into provisional bankruptcy and stating that the liquidators "require that all outstanding accounts be brought up to date . . . before production of your new or existing orders can commence."  (Mot. for Summ. J., at Ex. 3.)  On January 25, 2010, Steven Heywood ("Heywood"), a Castellano employee, sent an email to Finer stating that Castellano had inventory of "Portfolio and Jeweled Ranges" and that it would "naturally prefer" Fabricut to buy them.  (*See*

---

[6] These invoices total $57,290.62.

6

*id.* at Ex. D-2.) The following day, on January 26, 2010, Finer responded by stating his concerns regarding Heywood's authority to enter into transactions on behalf of Castellano following appointment of a liquidator. Finer also offered to buy certain inventory in Florida "at some discount . . . to satisfy [his] customers and stem the losses that mount daily." (*Id.*) On January 26, 2010, Voigt sent Finer an email stating that he had requested Heywood's assistance with collecting debt and selling inventory. Voigt also requested that Finer respond as to whether Fabricut wished Castellano to manufacture outstanding orders. Voigt did not respond to Finer's offer regarding the Florida inventory, and Finer did not agree to any further manufacturing of outstanding orders.

## II. Governing Law

The parties agree that (1) Oklahoma law governs the dispute, and (2) Article 2 of the Oklahoma Uniform Commercial Code ("OUCC") is applicable because all transactions underlying the parties' claims are "transactions in goods." *See* Okla. Stat. tit. 12A, § 2-102 (article applies to "transactions in goods"); *id.* § 105(1) (defining goods).[7]

## III. Voigt's Motion for Summary Judgment - Breach of Contract

Voigt moves for summary judgment on its claim for breach of contract, arguing that the invoices reflect unpaid amounts due and owing for goods received and kept by Fabricut. Fabricut admits that it received and kept the goods without paying the invoices but asserts that questions of fact preclude summary judgment in favor of Voigt as to thirty-three of the forty-two invoices. Fabricut does not dispute that payment is due for the remaining nine invoices totaling $31,070.23.

---

[7] Because the original briefs were based almost exclusively on Oklahoma common law and not the OUCC, the Court ordered additional briefs on the OUCC's applicability. Both parties agreed that the OUCC applies and re-couched certain arguments in terms of the OUCC.

### A.     Jeweled Collection

With respect to the twenty-four invoices that allegedly relate to Jeweled Collection product, Fabricut argues that it rejected the products based on the defective bead.[8] Under the OUCC, a buyer in receipt of non-conforming goods has several "rights." *See* Okla. Stat. tit. 12A, § 2-601 (setting forth buyer's rights upon delivery of non-conforming goods to reject the whole, accept the whole, or accept any commercial unit or units and reject the rest). If a buyer of non-conforming goods (1) rejects the goods, or (2) accepts the goods but then subsequently revokes such acceptance, the buyer is "freed from its obligation to pay the purchase price" or may recover that portion of the purchase price already paid. *CMI Corp. v. Leemar Steel Co., Inc.*, 733 F.2d 1410, 1414 (10th Cir. 1984) (citing Okla. Stat. tit. 12A, § 2-602)).

Fabricut's evidence is sufficient to preclude summary judgment as to these twenty-four invoices. First, it appears to be undisputed that the goods were non-conforming. Cash testified that Castellano acknowledged the problem with the defective bead after seeing it. In correspondence, Castellano representatives referred to the product as "defective" and entered into negotiations to attempt to remedy the problem. At a minimum, Fabricut's evidence is sufficient to survive a motion for summary judgment on the question of non-conformity.

Second, there exists a question of fact as to whether the Jeweled Collection product was "rejected" by Fabricut. Under the OUCC, the "rejection of goods occurs when a buyer, within a reasonable time after the delivery or tender, seasonably notifies the seller of his rejection." *CMI*

---

[8] In its original response brief, Fabricut did not cite or apply the OUCC in support of this "rejection of defective goods" argument. Instead, Fabricut cited general common law rules regarding modification of a contract term. (*See* Resp. to Mot. for Summ. J. 12.) After the Court ordered additional briefing regarding the applicability of the OUCC, Fabricut explained its rejection argument in OUCC terms.

8

*Corp.*, 733 F.2d at 1414 (citing Okla. Stat. tit. 12A, § 2-602)). Any rejection must be "clear and unambiguous." *CMI Corp.*, 733 F.2d at 1414. A rejection is taken "'seasonably' when it is taken at or within the time agreed or within a reasonable time where no time is agreed upon." *Id.* (citing Okla. Stat. tit. 12A, § 1-204).

The record indicates that, upon inspection of the Jeweled Collection product, Cash promptly notified Castellano of the defect and communicated Fabricut's desire to return the defective product. Cash stated:

> I [Cash] complained promptly about the defect and sought to return the product to Castellano. Castellano representatives looked at the beads in Fabricut's warehouse, and acknowledged the defect immediately. Castellano delayed for months, however, in providing information requested by Fabricut as needed for return of the defective product. At the same time, Castellano's attempt to remake the product dragged on for months.

(Cash Aff., Ex. B to Resp. to Mot. for Summ. J., at ¶ 12; *see also* Cash Dep., Ex. E to Resp. to Mot. for Summ. J, at 14-15.)[9] Further, Fabricut never paid for the goods. Fabricut's evidence is sufficient to create a question of fact as to whether Fabricut clearly and timely rejected any Jeweled Collection product with the defective bead. *Cf. CMI Corp.*, 733 F.2d at 1414 (finding that no rejection occurred as matter of law where (1) buyer was not specific about defect but merely stated by telephone there was a "problem," (2) buyer paid for the goods, (3) both parties attempted to find a way to correct the defect, and (4) buyer then requested the seller pick up the goods and refund the price); *Electrical Power Sys., Inc.* v. *Argo Int'l Corp.*, 864 F. Supp. 1080, 1084 (N.D. Okla. 1994) (buyer failed to

---

[9] Although Cash's deposition testimony is less explicit than her affidavit, the two are in no way inconsistent. The Court therefore rejects Voigt's argument, made in its reply brief, that Cash's affidavit should be disregarded.

9

inspect and reject allegedly non-conforming goods by thirty-day deadline on invoice and therefore did not provide clear and seasonable notice of the defect).[10]

Finally, assuming the goods were initially accepted, the record creates a question of fact as to whether Fabricut revoked its acceptance. "Acceptance of goods occurs in Oklahoma when a buyer, after an opportunity to inspect them, relates to the seller that the goods are conforming or that he will take them despite their non-conformity, or where the buyer fails to make an effective rejection, or does any act inconsistent with the seller's ownership." *CMI Corp.*, 733 F.2d at 1414 (citing Okla. Stat. tit. 12A, § 2-606(1)). "[A] buyer may revoke his acceptance of goods of a nonconforming nature by notifying the seller within a reasonable time." *Id.* at 1415; *see Darrow v. Spencer*, 581 P.2d 1309, 1313 (Okla.1978); Okla. Stat. tit. 12A, §§ 2-607 and 2-608. "The question of whether a buyer's revocation of an acceptance is timely is, as with rejections, a question of fact." CMI Corp., 733 F.2d at 1415. "A buyer who properly revokes has the same rights with regard to the goods involved as if he had rejected them." *Id.*; *see* Okla. Stat. tit. 12A, § 2-608(3).

Fabricut's evidence could support a finding that it accepted the goods on the assumption that Castellano would either cure the non-conformity or agree to a reasonable discount on the product, which it ultimately failed to do. Upon Castellano's failure to cure and the breakdown of any such negotiations, Fabricut could be deemed to have revoked any acceptance that occurred. *See CMI*

---

[10] In *Electrical Power Systems,* 864 F. Supp. at 1085, the court noted that cases involving oral rejection had not "fared well in courts." However, the code does not explicitly require a written rejection. The record evidence in this case includes repeated oral notification of the problem and written correspondence from the seller indicating that it had actual notice of the alleged defect. The Court finds this sufficient to create a question of fact.

*Corp.*, 733 F.2d at 1415 (finding that buyer was relieved of its obligation to pay the purchase price where (1) buyer accepted goods on assumption that seller would cure non-conformity by grinding certain product down to its specified size; (2) seller failed to cure; (3) non-conformity substantially impaired value; (4) seller was aware that product did not meet specifications and could not be used as manufactured; (5) parties unsuccessfully attempted to find party that could "cure" non-conformity; and (6) seller then refused to pick up product following request). Based on the factual questions raised by Fabricut's evidence, Voigt is not entitled to summary judgment as to any invoices for Jeweled Collection product.

**B.     Anthology Collection**

With respect to the nine invoices that allegedly relate to Anthology Collection sample books, Fabricut argued that a question of fact exists regarding the accuracy of the invoiced amounts:

> Fabricut prepaid $80,000 for these sample books, which had not yet been produced or delivered. This was an unprecedented step, and one taken by Fabricut in the interest of furthering its business relationship with Castellano. The subject Voigt invoices do not reflect this prepayment. This dispute over what amount, if any, is owed by Fabricut on those invoices precludes summary judgment.

(Resp. to Mot. for Summ. J. 11.) In its supplemental brief addressing the OUCC, Fabricut argued that failure of the invoices "to expressly reflect the Prepayment does not keep the Prepayment from determining the price of the goods agreed upon." (Supp. Resp. to Mot. for Summ. J. 4-5 (citing "12A O.S. § 2-207(b)" as stating that if "'a contract formed in any manner is confirmed by a record that contains terms additional to or different from those in the contract being confirmed,' any terms to which both parties agree become part of the agreement 'whether in a record or not'").)[11] Voigt

---

[11] Fabricut purports to quote § 2-207(b) of the OUCC; however, such provision does not exist. The quotation by Fabricut is from a provision of the Uniform Commercial Code that has not been adopted in Oklahoma. *See Rogers v. Dell Computer Corp.*, 138 P.3d 826, 832 (Okla. 2005)

11

argues that Fabricut has not presented sufficient evidence to establish that the $80,000 payment related to the invoiced products. (*See* Reply in Support of Mot. for Summ. J. 3 ("Fabricut has provided no citations that support that the $80,000 was a prepayment for anything, or that this alleged prepayment was not previously deducted by Castellano.").) Voigt did not make any arguments specifically related to this issue in its supplemental brief addressing the OUCC.

Fabricut has presented sufficient evidence to support a finding that the $80,000 payment related to the Anthology Collection sample books, which are the subject of nine relevant invoices. Finer offered detailed testimony regarding Castellano's production problems, cash-flow problems, and request for assistance from Fabricut. Fabricut also offered (1) checks dated December 2008, which corresponds with Finer's testimony, (Ex. C-1 to Resp. to Mot. for Summ. J.); and (2) the affidavit of Cherie Wilson, accounts payable manager at Fabricut, stating that "Fabricut made two payments of $40,000 each to Castellano as pre-payments for sample books," (Ex. C to Resp. to Mot. for Summ. J). This evidence creates a question of fact as to whether the $80,000 related to the Anthology Collection sample books, and Voigt is not entitled to summary judgment based on the factual arguments it presented.[12]

---

("Neither Oklahoma nor Texas has adopted the 2003 amended version of section 2–207. Thus, we do not apply the 2003 amendment to section 2–207 in this case."). Thus, Fabricut's reliance on this language is misplaced.

[12] Assuming Fabricut can establish as a factual matter that the parties reached agreement as to the effect of the $80,000 payment, the Court must determine the proper legal framework for analyzing such agreement. In their trial briefs and proposed findings of fact and conclusions of law, the parties should address whether the legal analysis of any such agreement arises under § 2-207 (governing additional terms in acceptance or confirmation), § 2-209 (governing modifications), or some other OUCC provision or other principle of law. The parties may argue in the alternative.

C.  **Conclusion**

Voigt is entitled to summary judgment as to the nine undisputed invoices totaling $31,070.23. Voigt is not entitled to summary judgment as to the twenty-four invoices allegedly related to the Jeweled Collection product or the nine invoices allegedly related to the Anthology Collection sample books.

IV. **Voigt's Motion for Summary Judgment – Account Stated**

Oklahoma law defines an account stated:

> An account stated is an agreement, express or implied. *The amount or balance so agreed upon constitutes a new and independent cause of action, superseding and merging the antecedent causes of action represented by the particular constituent items.* An account stated is a new obligation, taking the place of the obligation upon the prior account.

*Discover Bank v. Worsham*, 176 P.3d 366, 369 (Okla. Civ. App. 2007) (internal citations omitted) (quoting *Webster Drilling Co. v. Sterling Oil of Okla, Inc.*, 376 P.2d 236, 238 (Okla. 1962)). The Oklahoma Supreme Court has explained that negotiations and subsequent agreement of the parties can "change the nature of the [original] obligation into an account stated," such that the "agreement on a balance owed becomes a new and independent obligation that supercedes and merges the prior contractual obligation." *State ex rel. State Ins. Fund v. Accord Human Res., Inc.*, 82 P.3d 1015, 1017-18 (Okla. 2003).

The Court sua sponte grants summary judgment in favor of Fabricut as to the account stated claim. As explained above, with respect to thirty-three of the forty-two invoices at issue, Fabricut consistently disputed the invoices and refused to pay the invoices for specific reasons. While the Court has found Fabricut liable for breach of contract as to nine invoices, there is certainly no evidence that the parties reached any express or implied agreement that such invoices reflected

13

proper amounts owed. *Cf. Discover Bank*, 176 P.3d at 369 (non-party to credit agreement was nonetheless bound to pay balance under theory of account stated, where she continued use of the credit card for four years after death of card holder, continued to pay at least the minimum amounts due under the agreement, incurred the debt in accordance with the terms of the original agreement, and did not dispute amounts owed). Accordingly, Fabricut is entitled to judgment as a matter of law on the account stated claim.

## V.     Voigt's Motion for Summary Judgment – Unjust Enrichment

The general "hornbook" rule is that quasi-contractual remedies such as unjust enrichment "are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue." *Member Servs. Life Ins. Co. v. Am. Nat'l Bank and Trust Co. of Sapulpa*, 130 F.3d 950, 957 (10th Cir. 1997). However, Oklahoma courts do not, in every instance, follow this general rule. *See French Energy, Inc. v. Alexander*, 818 P.2d 1234, 1238 (Okla. 1991) (finding that, although there was an express contract between the parties on the subject matter in question, equity required that the contract be rescinded and restitution paid to prevent unjust enrichment); *Lapkin v. Garland Bloodworth, Inc.*, 23 P.3d 958, 964 (Okla. Civ. App. 2000) ("This court has held that an express contract between parties does not preclude rescission and a finding of unjust enrichment where equity demands such a result."). However, in the above-cited cases, the courts found the remedy of unjust enrichment necessary because the parties presented evidence justifying rescission of the original contract. *See also Roberson v. PaineWebber, Inc.*, 998 P.2d 193, 200 (Okla. Civ. App. 1999) (holding that question of fact existed as to unjust enrichment claim, despite express contract, where fraud and manipulation involved in procurement of the contract arguably justified its rescission).

14

In this case, Voigt's claim for unjust enrichment is simply that Fabricut has in its possession, or has already sold, certain products sent pursuant to the invoices without paying for them. Voigt does not allege any fraud, manipulation, or other conduct by Fabricut that implicates a possible rescission of the original purchase contracts or any need to resort to quasi-contractual remedies. Therefore, the Court sua sponte grants summary judgment in favor of Fabricut as to the unjust enrichment claim.

## VI. Voigt's Motion for Summary Judgment - Fabricut's Recoupment Defense

Castellano is the subject of a South African bankruptcy proceeding. The Court nonetheless allowed Fabricut to proceed against Voigt for any of Castellano's pre-sequestration breaches of the promise of product continuity under the theory of recoupment, as generally applied in suits brought by a bankrupt estate. Following is a general explanation of recoupment:

> Recoupment is a common-law, equitable doctrine that permits a defendant to assert a defensive claim aimed at reducing the amount of damages recoverable by a plaintiff. It allows a court to look at the whole contract, sum up the grievances on each side, strike a balance, and give plaintiff judgment for only such difference as may be found in his favor. The doctrine of recoupment allows a defendant to "defend" against a claim by asserting, up to the amount of the claim, the defendant's own claim against the plaintiff growing out of the same transaction, or set of transactions, strictly for the purpose of abatement or reduction of the plaintiff's claim. It encompasses the right of a defendant to reduce or eliminate the plaintiff's demand either because the plaintiff has not complied with some cross-obligation under the contract on which the plaintiff sues or the plaintiff has violated some legal duty in making or performing that contract.

80 C.J.S *Set-off and Counterclaim* § 2 (footnotes omitted); *see also In re Peterson Distrib., Inc.*, 82 F.3d 956, 959 (10th Cir. 1996) (explaining recoupment doctrine in context of U.S. bankruptcy law) ("Recoupment allows the defendant, in a suit between the estate and another, to show that because of matters arising out of the transaction sued on, he or she is not liable in full for the plaintiff's

claim.") (internal quotations omitted). "Thus, recoupment is an equitable doctrine that allows the determination of a just and proper liability regarding such a claim." *Id.* (internal quotations omitted).

In bankruptcy cases, recoupment is narrowly construed because it violates the basic bankruptcy principle of equal distribution to creditors. *See id.* (explaining that pre-petition debts generally may not be satisfied through post-petition actions). For the same reasons, "same transaction" is a term of art in the context of bankruptcy recoupment. *See id.* In order for claims to arise from the same transaction for the purposes of recoupment, "both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *Id.* (internal quotations omitted).

Applying these principles, the Court found, at the pleading stage, that the equitable doctrine of recoupment permitted Fabricut to recoup, up to the amount ultimately recovered by Voigt, any amounts owed to it for breaches committed by Castellano in connection with the same transactions or set of transactions giving rise to Voigt's claims.[13] At this summary judgment stage, Voigt essentially makes two arguments: (1) the alleged breaches of the promise of product continuity do not arise from the same transactions or set of transactions for which Voigt seeks payment; and (2) the promise of product continuity is not a term of any agreement underlying the subject invoices.

### A. Same Transactions or Set of Transactions

Fabricut has presented sufficient evidence to survive summary judgment as to the question of whether Fabricut's claim for breach of the promise of product continuity arises from the same

---

[13] The Court ruled that Fabricut's alleged facts supported a recoupment theory and therefore allowed the claim to proceed in this manner. The Court did not intend to make a final factual determination that the claim arose from the same transaction or set of transactions.

transactions or set of transactions for which Voigt seeks payment.[14] Fabricut claims and has presented evidence demonstrating that Castellano breached a promise contained in each purchase agreement for the invoiced goods, which the Court construes as a claim for breach of an express warranty. *See* Okla. Stat. tit. 12A, § 2-313(1) (defining express warranty as "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain").[15] This claim for breach of a promise flowing with the goods falls within "the [equitable] right of a defendant [in a suit brought by a bankrupt entity] to reduce or eliminate the plaintiff's demand either because the plaintiff has not complied with some cross-obligation under the contract on which the plaintiff sues or the plaintiff has violated some legal duty in making or performing that contract." 80 C.J.S Set-off and Counterclaim § 2 (footnotes omitted); *see also Matter of Penn. Tire Co.*, 26 B.R. 663, 675 (Bankr. Ohio 1982) ("The court is satisfied that the respective liabilities of [p]laintiff and [d]efendant stem from the same set of transactions, as the tires in question were sold to [d]efendant with express warranties under the program then in effect; a refusal to allow recoupment would ignore the integration between contract and warranty which is one of the main features of Article 2 of the Uniform Commercial Code.").

Voigt argues that Fabricut could not have suffered any damages flowing from the breach of the promise of "product continuity" associated with *these forty-two invoices* because all products reflected in such invoices were actually received. (*See* Supp. Br. in Support of Mot. for Summ. J.

---

[14] The Court will make a final determination as to this question following the non-jury trial, and the parties should include arguments regarding this question in their trial briefs and proposed findings of fact and conclusions of law.

[15] Fabricut did not expressly allege breach of an express warranty; however, this OUCC provision appears to apply to Fabricut's evidence. Fabricut is free to assert other theories of liability and remedies at trial.

4 ("[A]ny damages that Fabricut allegedly suffered due to loss of continuity result from Castellano's alleged failure to fill *other purchase orders* that Fabricut placed or would have placed had Castellano remained capable of filling them (emphasis added)."). This argument ignores the alleged purpose of the promise of product continuity. Such promise, as described by Finer, reflected the reality that sample books or product for a particular trimming program become less valuable if production of the product ceases prior to the agreed continuity period. According to Fabricut, the promise recorded in the specification sheets reflected an agreement that, once sample books were distributed for a particular trimmings program, the products therein would continue to be manufactured and available from Castellano for an additional three years. Thus, although Fabricut received the invoiced goods (either sample books or product), Fabricut could have nonetheless suffered damages if (1) those goods were accompanied by a promise of product continuity; (2) breach of the promise of product continuity directly affected the use and value of any goods received; and/or (3) breach of the promise of product continuity affected the value of the trimmings program as a whole and caused it to suffer other types of damages. *See generally In re B&L Oil Co. v. Ashland Pet. Co.*, 782 F.2d 155, 158 (10th Cir. 1986) (citing example of proper recoupment claim as "a situation in which a building owner resists paying the contract price because of a bankrupt contractor's deficient work" and explaining that the overall goal of recoupment is to reach an equitable outcome between the parties).

The Court therefore finds that Voigt is not entitled to summary judgment on this issue.

### B. Term of Purchase Agreements

Voigt also appears to assert that the promise of product continuity was never incorporated into any of the relevant purchase contracts. (*See* Supp. Br. in Support of Mot. for Summ. J. 4

("[N]one of those purchase orders or the invoices that resulted therefrom contain any promise of continuity.").[16] However, Fabricut has presented evidence that the specification sheets were signed by Castellano after completion of the development process and prior to the placement or shipment of any orders. Fabricut has also presented evidence that these specification sheets related to the Jeweled Collection and the Anthology Collection, which are the subject of at least some of the relevant invoices. This is sufficient to survive summary judgment as to whether the promise of product continuity was incorporated into any subsequent purchase contracts related to those products. *See Rogers v. Dell Computer Corp.*, 138 P.3d 826, 832 (Okla. 2005) (explaining that an arbitration provision would have become a term of the governing purchase contracts "if it were incorporated into them at the time the plaintiffs placed the orders").[17]

## VII. Voigt's Motion for Summary Judgment - Fabricut's Counterclaim

Fabricut's post-bankruptcy counterclaim is based upon the parties' post-bankruptcy dealings explained *supra* Part I.C.4. Fabricut argues that the circumstances create questions of fact as to (1) whether Voigt and Fabricut entered into an agreement for the sale of existing Castellano inventory; and (2) whether Voigt violated its covenant of good faith under such agreement. (Resp. to Mot. for Summ. J. 19.) Voigt argues that no agreement existed and no breach occurred as a matter of law.

The undisputed facts demonstrate that Fabricut and Voigt did not enter into an agreement for the sale of existing Castellano inventory located in Florida. Finer's January 26, 2010 email was

---

[16] This argument consisted of one sentence and was not well explained or developed.

[17] At trial, Fabricut may argue and assert other theories under which the promise of product continuity became incorporated into the relevant contracts. The Court simply finds, for purposes of summary judgment, that Fabricut has presented sufficient evidence to support a finding that the promise was an express term of the parties' agreements via the specification sheets.

an offer to purchase such inventory, but Voigt's response to Finer was silent as to such offer. There is no other evidence that the parties reached any subsequent agreement regarding manufacturing of outstanding orders. Accordingly, Voigt and Fabricut did not enter into any post-bankruptcy contract, and Voigt is entitled to judgment as a matter of law.

## VIII. Voigt's Motion in Limine

Voigt moved the Court to preclude argument or testimony "pertaining to a potential award on Fabricut's recoupment claim in excess of the amount Voigt seeks on his counterclaim." (Mot. in Limine 4.) During the non-jury trial, Fabricut shall be permitted to present evidence of any and all damages it allegedly suffered as a result of Castellano's breach of the promise of product continuity. However, the Court will utilize such damages evidence only for the purpose of offsetting any amounts owed on Voigt's claim against Fabricut. This motion in limine was unnecessary in light of the Court's previous rulings and will be denied.

## IX. Conclusion

Plaintiff Merrick Voigt's Motion for Summary Judgment (Doc. 50) is GRANTED IN PART AND DENIED IN PART as follows. It is granted as to Fabricut's counterclaim based on the parties' post-bankruptcy dealings. It is denied as to Voigt's claims and as to Fabricut's recoupment defense. The Court sua sponte grants summary judgment in favor of Fabricut as to Voigt's claims for account stated and unjust enrichment. Voigt's Motion in Limine Concerning Recoupment (Doc. 55) is DENIED. The parties are to submit a revised Pretrial Order no later than Tuesday, April 10, 2012, at 9:00 am.

SO ORDERED this 6th day of April, 2012.

*Terence Kern*

**TERENCE KERN**
**United States District Judge**